**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| Plaintiff, | ) Case No. 13-cv-1527 |
| v. | ) Judge John W. Darrah |
| SUBSCRIBERBASE HOLDINGS, INC., a South Carolina corporation, *et al.*, | ) Magistrate Judge Geraldine Soat Brown |
| Defendants. | ) |

**FEDERAL TRADE COMMISSION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER WITH OTHER EQUITABLE RELIEF AND ORDER TO SHOW CAUSE <u>WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE</u>**

**I.     INTRODUCTION**

      The Federal Trade Commission asks that this Court take immediate action against an enterprise that deceptively promises "free" $1000 Best Buy gift cards to consumers.  The "free" merchandise is anything but free.  Rather, to obtain these "free" items, consumers must spend money on several dubious product "offers" and must divulge personal information that Defendants then sell to third-party marketers.

      Consumers are lured into this scheme through spam text messages sent to their cellular telephones.  These messages entice consumers with promises of "free" gift cards and include links that take consumers to a series of websites controlled by Defendants.  Consumers across the country have submitted thousands of complaints about these spam text messages.  The sending of the spam text messages is an unfair practice that collectively has cost consumers hundreds of thousands of dollars in unwanted text message fees.

      At Defendants' websites, consumers gradually learn that to get the "free" merchandise they must navigate several steps.  First, Defendants ask consumers for their personal information, which they claim is needed to ship the "free" gift cards.  Few, if any, consumers ever receive the "free" gift cards, but Defendants then sell consumers' personal information to third-party marketers.  Second, consumers then must sign up for several product "offers," all of which cost money or involve ongoing obligations.  Consumers who actually complete the offers—thirteen, in all—are then told that they must refer three friends to do the same.  None of these requirements are adequately disclosed on Defendants' websites.  Over the last two years, Defendants have earned millions of dollars from these practices.

      The FTC asks this Court to immediately stop the Defendants' false claims, deceptive sale of consumers' personal information, and spam texting campaign.  We also ask that the Court

order Defendants to preserve their assets. The proposed temporary restraining order would preserve the Court's ability to provide effective final relief at the conclusion of this case.

## II. DEFENDANTS' ILLEGAL BUSINESS PRACTICES

Consumers who click on the links in the spam text messages must proceed through a series of Defendants' websites to try to obtain the "free" merchandise.[1] The deceptive claims about purportedly "free" merchandise are made both in text messages that are sent by others on Defendants' behalf, and on Defendants' own websites.

### A. Defendants' Text Message Spam

Defendants are responsible for text message spam that has flooded cellular telephones across the country. The FTC has received thousands of complaints of text message spam promoting "free" merchandise.[2] These texts collectively cost consumers millions of dollars.[3] In addition, Best Buy and other retailers and wireless carriers whose customers receive the text message spam have devoted significant resources to addressing Defendants' scheme.[4]

---

[1] The Court has personal jurisdiction over Defendants under the FTC Act because Defendants have minimum contacts with the United States. *See FTC v. Cleverlink Trading Ltd.*, No. 05-cv-2889, 2006 WL 1735276, at *4 (N.D. Ill. June 19, 2006). Venue is also proper because Defendants transact business here. *See* 15 U.S.C. § 53(b); *see also* Declaration of Douglas M. McKenney ("McKenney Dec."), Plaintiff's Exhibit ("PX") 1, ¶¶ 52, 57(f), 61(g) (payments of $700,000 to Chicago company); *id.* ¶¶ 80-82 (text messages received in Chicago); *id.* ¶ 76 (announcement of SubscriberBASE's Chicago office).

[2] Consumers often complain generally about receiving text message spam promoting "free" merchandise. *See id.*, ¶¶ 77 & 79. Several dozen complaints specifically mention Defendants' websites. *See, e.g.*, *id.* ¶ 78 & Att. P. Media also has reported on the "free" merchandise scam. *Id.* ¶ 85 & Att. T.

[3] Declaration of Donald B. Farren ("CTIA Dec."), PX9, ¶¶ 6(2)-(3) (attesting that millions of consumers pay for text messages each month).

[4] Declaration of Lisa Smith, PX6 ¶¶ 2, 6 (harm to Best Buy by text message spam promoting "free" gift cards); Declaration of Cheri Kerstetter, PX7 ¶¶ 3, 4 (AT&T's efforts to curb spam text and 240,000 subscriber complaints of spam text suggesting subscribers had "won" something "free").

The Defendants pay affiliate marketers to send these text messages.[5] The text messages claim that the consumer has won a free gift card, stating, for example, "Your entry in our drawing WON you a free $1,000 Best Buy GiftCard! Enter '614' at www.bestbuy.com.tbtt.biz so we can ship it to you immediately."[6] Each text message contains a hyperlink which, if clicked, leads the consumer to the Defendants' websites. The FTC is concurrently filing seven separate cases against senders of those illegal text messages.

B.  **The All Square Defendants' Websites**

Links in the spam text messages lead consumers first to a series of webpages operated by the "All Square" defendants. Because consumers receive the spam text messages on their mobile phones, they often view these websites on the small screen of a phone.

The first webpage proclaims, "Get a Free BEST BUY Gift Card" and "Congratulations! You Qualify for a FREE $1,000 Best Buy Gift Card" alongside images of a Best Buy gift card and a Best Buy employee. Consumers are asked to submit their email address to continue.[7]

Consumers who submit this information proceed to a second webpage, which states, "Congratulations! Tell us where to send your $1000 BestBuy [sic] Gift Card!",[8] and requests consumers' personal information, including their name, address, email address, date of birth, and cellular telephone number. Consumers are told that this information is necessary to send

---

[5] *See* McKenney Dec., PX1, ¶¶ 3-5 (describing affiliate marketing); *see also id.* ¶¶ 19-20, 33-34 (text message spam leading to Defendants' websites); *id.* ¶¶ 80-82 & Att. Q (same); *id.* ¶¶ 77-78 & Att. P (consumer complaints of Defendants' text message spam).

[6] *See id.* ¶ 19 & Att. B at 1.

[7] *See, e.g.*, McKenney Dec., PX1, ¶ 10 & Att. A at 2; *id.* ¶ 70 (identifying website as paid for by All Square defendants Brent Cranmer and Slash 20, LLC); *id.* ¶ 22 & Att. B at 5; *id.* ¶ 70 (identifying website as paid for by All Square defendants Cranmer and Slash 20). In some instances, the link in the text message spam takes consumers first to a third-party website that furthers the deception, requesting consumers for the "code" listed in the text message spam, and informing consumers who comply that they have a "Winning Code." *See, e.g.*, *id.*, ¶¶ 20-21 & Att. B at 2-4. Consumers who enter such a code are then redirected to the All Square defendants' websites, described above.

[8] *Id.*, ¶ 15, Att. A at 14-15.

consumers the "free" gift card. Consumers who submit this information proceed to a group of websites operated by the "SubscriberBASE" defendants.

### C.   The SubscriberBASE Defendants' Websites

The SubscriberBASE defendants' websites tell consumers that they have reached the "Last Step." These websites present each consumer with a FedEx label with the consumer's submitted personal information printed on it. The SubscriberBASE defendants' websites instruct the consumer, "Tell us where to ship your $1,000 Best Buy Gift Card." To continue, the consumer must click a button marked, "Send It!"[9]

Consumers who click that button learn that they have not claimed the "free" gift card. Instead, Defendants inform consumers that they must sign up for third-party product "offers." Even then, Defendants tell consumers only half-truths, instructing them to "participate in" or "complete" one or two of several third-party offers.[10] These offers often require consumers to spend money or incur other obligations. For example, two "trial" offers last just eight days, after which the consumer automatically would be charged $78.41 per offer until the consumer canceled.[11] Later pages on these websites contain still more offers consumers must sign up for, telling weary consumers that a "Free $1,000 Best Buy Gift Card" is "Reserved" for them.[12]

### D.   Defendants' Inadequate Fine Print

Defendants do not tell consumers the truth about the "free" gift cards, instead burying it in fine print consumers will never see. The fine-print disclosures concede that there actually are costs to obtain the gift card: consumers must sign up for a total of thirteen third-party offers and

---

[9]   McKenney Dec., PX1, ¶ 17, Att. A at 19; *id.*, ¶ 24, Att. B at 9; *id.*, ¶ 32, Att. C at 7.

[10]  *Id.*, ¶ 18, Att. A at 20; *id.*, ¶ 25, Att. B at 10; *id.*, ¶ 32, Att. C at 8.

[11]  *See, e.g.*, McKenney Dec., PX1, ¶ 26, Att. B at 14-21 (showing, at pages 17 and 21 separate, hyperlinked terms and conditions providing for recurring charges).

[12]  *Id.*, ¶ 18, Att. A at 24; *id.*, ¶ 25, Att. B at 29; *id.*, ¶ 32, Att. C at 12.

convince three friends to do the same.[13] In this fine print, Defendants also admit why they really want consumers' personal information: to sell it.[14] And Defendants do sell consumers' personal information, causing consumers to be deluged with email spam.[15] Consumers cannot easily see and understand these disclosures on a cell phone screen, where they likely appear like this:[16]



Defendants' websites also occasionally state, in small font, "Participation Required, <u>Click for Details</u>."[17] This unexplained term does not signal what "participation" means, or that the gift card prominently touted as "free" is not in fact free.

---

[13]     *See, e.g.*, McKenney Dec., PX1, ¶¶ 10-11, Att. A at 2.

[14]     *Id.*, ¶ 11, Att. A at 2 ("Your information will be shared with our marketing partners."); *id.* ¶ 14 Att. A at 12 ("We may also share your information with affiliated and non-affiliated third-parties . . . . By providing your personally identifiable information through the Site, you have consented and given your express written permission to receive offers from such non-affiliated third parties.").

[15]     *Id.*, ¶¶ 42-43 (noting hundreds of spam emails received after submitting address on Defendants' websites, including emails with subject lines, "Lose weight with this 1 simple ingredient!"; "My Russian Bride webcam is now live …!"; and "Increase your sexual stamina with Vydox."); *see id.*, ¶ 81, Att. P at 19-20.

[16]     *See, e.g.*, *id.*, ¶¶ 10-11, Att. A at 2.

[17]     *See, e.g.*, McKenney Dec., PX1, ¶ 10, Att. A at 2.

### III. DEFENDANTS

There are two sets of defendants involved in this enterprise, each of which operate as a common enterprise. These two sets of defendants operate their scheme jointly and seamlessly. They reap millions from selling consumers' personal information and from tricking consumers into signing up for costly third-party offers in the hopes of obtaining "free" merchandise.

#### A. The All Square Defendants

As noted, the first websites consumers are taken to by the spam text messages are owned and operated by the All Square defendants, based in Aliso Viejo, California.[18] They include four related companies, which operate as a common enterprise, and three individuals. The four companies share employees,[19] commingle funds, and opened bank accounts on the same day, at the same bank, using the same lone signatory.[20]

One company, defendant **Slash 20, LLC**, registers most of the "free" merchandise websites where consumers divulge their personal information.[21] Slash 20 receives payments from defendant **PC Global Investments, LLC**,[22] which in turn has been paid more than one

---

[18] *Id.*, PX1, ¶¶ 47-49, 65(c), Att. H-J (showing Defendants' addresses in California, including in Aliso Viejo); *id.* ¶¶ 65(e) & 73(c) & (e) (showing Defendants' use of Internet Protocol ("IP") address 98.191.147.2); *see also* Certification of Saquonna Wheeler, Cox Communications, Inc. ("Wheeler Dec."), PX4, Att. at 1-4 (showing IP address 98.191.147.2 assigned to account in Aliso Viejo and payments on account from defendants PC Global Investments and Threadpoint).

[19] *See* McKenney Dec., PX1, ¶¶ 65(a)-(b) (PayPal account belonging to Brent Cranmer and Slash 20); *id.*, ¶ 68 & Att. M (Cranmer's LinkedIn profile listing employer as PC Global Investments).

[20] *See id.* ¶¶ 56-64 (describing All Square defendants' bank records, transfers between All Square defendants bank records, and nearly identical signature cards). As a common enterprise, these companies are jointly and severally liable for the challenged practices. *See FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000) (*citing Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973) *and Delaware Watch Co. v. FTC*, 332 F.2d 745, 746-47 (2nd Cir. 1964)), *aff'd in relevant part*, 312 F.3d 259 (7th Cir. 2002).

[21] *See* McKenney Dec., PX1, ¶¶ 70-71.

[22] *See id.* ¶¶ 63(c). PC Global Investments also performs services necessary to further the scheme. *See* Wheeler Dec., PX4, Att. at 3 (attaching payment records for Internet service); *see* Certificate of

million dollars by defendants **All Square Marketing, LLC** and **Threadpoint, LLC**.[23] These defendants, in turn, have been paid millions by the SubscriberBASE defendants for drawing consumers to the SubcriberBASE defendants' websites.[24]

The All Square defendants also include three individuals. **Michael Mazzella**, the Vice President of All Square Marketing, signs contracts on its behalf and set up "free" merchandise websites.[25] **Brent Cranmer**, the Senior Finance Manager of PC Global Investments,[26] has operated the PayPal account used to pay for many of the "free" merchandise websites and has paid for advertising that leads consumers to those websites.[27] **Christopher McVeigh** has helped register these websites and attract advertising for them, in turn receiving nearly $480,000.[28]

B.  **The SubscriberBASE Defendants**

The SubscriberBASE defendants are two South Carolina corporations, **SubscriberBASE Holdings, Inc.** and **SubscriberBASE, Inc.**, and their principal, **Jeffrey French**. These entities

---

Authenticity, Google Inc., PX5, at 2 (showing email address "allsquaredomains@gmail.com" registered listing domains@pcinvestmentcorp.com as its "Secondary email").

[23]   McKenney Dec., PX1, ¶¶ 57(c) & 61(c).

[24]   *See id.*, ¶ 52. All Square Marketing also set up websites used as part of the scheme. *See id.*, ¶¶ 70-73; *see also* Certificate of Authenticity of Business Records from NameCheap, Inc. ("NameCheap Dec."), PX2, Att. at 13 (attaching records from "squaremarketing" account using All Square Marketing's Aliso Viejo address). All Square Marketing also hired marketers to bring consumers to the All Square defendants' websites. *See* McKenney Dec., PX1, ¶ 67(a) & (j) & Att. L at 1-8, 17-19 (noting All Square Marketing's use of an affiliate network); *see also id.*, ¶¶ 3-5 (describing affiliate marketing).

[25]   *See id.*, ¶ 67(j) & Att. L at 17-19; *see also id.*, ¶¶ 70 & 73(a) (identifying websites registered through NameCheap by "mazzco" and paid for by Mazzella); NameCheap Dec., PX2, Att. at 1-4 (attaching records of registration of websites).

[26]   *See* McKenney Dec., PX1, ¶ 68 & Att. M (attaching Cranmer's LinkedIn profile).

[27]   *See id.* ¶¶ 70-71 (listing "free" gift card websites paid for through a PayPal account registered by Brent Cranmer and Slash 20); *see also* NameCheap Dec., PX2, Att. at 9-12, 19-25, 29, 31-32, 36-38 (showing registration of websites and payment by Brent Cranmer/Slash 20 PayPal account); *see also id.*¶ 67(e) & (h), Att. L at 9-11 & 14.

[28]   *See* McKenney Dec., PX1, ¶ 46 & Att. G (showing McVeigh as principal of CMB Marketing); *id.* ¶ 66(a) & Att. K at 1 (showing IP address assigned to CMB Marketing); *id.* ¶ 73(a) (showing IP address assigned to CMB Marketing used to purchase "free" merchandise websites); *id.* ¶ 67(f) & Att. L at 12-13; *id.* ¶¶ 57(d) & 61(e) (showing payments from All Square Marketing and Threadpoint to CMB Marketing).

are a common enterprise, sharing office space and officers.[29] They operate the websites where consumers must sign up for numerous offers to obtain "free" merchandise.[30] Consumers are drawn to the SubscriberBASE defendants' websites by the All Square defendants, which SubscriberBASE Holdings pays from an account controlled by French.[31]

The SubscriberBASE entities twice have settled charges by state Attorneys General of deceptive marketing of "free" goods; French signed one such settlement. In 2008, the SubscriberBASE entities agreed to stop marketing any products as "free" to consumers in the State of Washington, and also agreed not to sell those consumers' personal information.[32] Less than two years ago, French, on behalf of SubscriberBASE Holdings, signed a settlement with the Florida Attorney General agreeing not to misuse the term "free" in its advertising or that of its third-party marketers.[33]

## IV. ARGUMENT

Defendants (1) fail to disclose that "free" merchandise really is not free, (2) elicit consumers' information claiming it is for shipping a gift card when Defendants really sell it to other marketers, and (3) flood consumers' cellular telephones with unwanted text messages, each in violation of the Federal Trade Commission Act (the "FTC Act"). The FTC asks that this Court issue the proposed temporary restraining order ("TRO") to prohibit Defendants' ongoing

---

[29] *See id.* ¶ 44(c)-(d) & Att. E at 5-8; *id.* ¶ 45(b)-(c) & Att. F at 3-6 (showing companies changed addresses, to the same address, on the same date, then assumed same registered agent on same date; also showing French as President of both companies).

[30] *See, e.g.*, McKenney Dec., PX1, ¶¶ 17-18 & Att. A at 19-31 (SubscriberBASE defendants' website); *see also, e.g., id.*, ¶ 32 & Att. C at 7-17 (same); *see also* Certification of Records of Regularly Conducted Activity, DNC Holdings, Inc. ("DNC Dec."), PX3, Att. at 3, 7-8 (showing registration of websites by SubscriberBASE Defendants).

[31] *See* McKenney Dec., PX1, ¶ 51.

[32] *See id.* ¶ 83 & Att. R at 4-5.

[33] *See id.* ¶ 84 & Att. S at 8-9.

illegal practices, preserve their assets, and require an accounting of their ill-gotten gains, thereby ensuring this Court's ability to provide effective final relief. This Court previously has granted similar TROs in FTC actions.[34]

### A. This Court Has the Authority to Grant the Requested Relief

The FTC Act provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). Once the Commission invokes a federal court's equitable powers, the full breadth of the court's authority is available, including the power to grant ancillary relief, such as a temporary restraining order, a preliminary injunction, and whatever additional preliminary relief is necessary to preserve the possibility of providing effective final relief. *FTC v. World Travel Vacation Brokers, Inc.* (*World Travel*), 861 F.2d 1020, 1026 (7th Cir. 1988); *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997); *FTC v. Amy Travel Serv., Inc.* (*Amy Travel*), 875 F.2d 564, 571-72 (7th Cir. 1989). Such ancillary relief may include an order to preserve assets. *See World Travel*, 861 F.2d at 1031.

### B. A Temporary Restraining Order is Appropriate and Necessary

To grant temporary injunctive relief, the district court must (1) determine the likelihood that the FTC ultimately will succeed on the merits, and (2) balance the equities. *Id.* at 1029. Under this "public interest" test, "it is not necessary for the FTC to demonstrate irreparable injury." *Id.* The TRO elements are easily satisfied here.

#### 1. Defendants Have Violated Section 5 of the FTC Act

To support injunctive relief at this stage, the Seventh Circuit requires proof of a "better than negligible" likelihood of success on the merits. *See Cooper v. Salazar*, 196 F.3d 809, 813

---

[34] *See, e.g.*, *FTC v. Fortune Hi-Tech Mktg., Inc.*, 13-cv-578 (N.D. Ill. Jan. 24, 2013) (*ex parte* TRO with asset freeze); *FTC. v. Bay Area Bus. Council, Inc.*, 02-cv-05762 (N.D. Ill. Aug. 14, 2012) (same).

(7th Cir. 1999) (quotation marks and citation omitted). The FTC's proof of Defendants' illegal conduct here far exceeds that standard.

The FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Defendants' violate the FTC Act in three ways. First, Defendants deceptively promise consumers "free" merchandise without telling them that they must pay money to claim it. Second, Defendants obtain consumers' personal information by claiming that they will ship consumers the "free" gift card, when in reality they sell this information to other dodgy marketers while rarely, if ever, providing the gift cards. Third, Defendants' affiliates inundate consumers' cellular telephones with unfair spam text messages that many consumers pay for but do not want and cannot avoid.[35]

### a. Defendants' "Free" Merchandise Websites are Deceptive

An act or practice is deceptive under the FTC Act if it is "likely to mislead consumers, acting reasonably under the circumstances, in a material respect." *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992) (citations omitted); *see also FTC v. Bay Area Bus. Council, Inc.* (*Bay Area*), 423 F.3d 627, 635 (7th Cir. 2005). The failure to disclose a material fact, such as by omitting it, is deceptive. *See Bay Area*, 423 F.3d at 635. A misrepresentation or omission that is likely to affect consumer choice is material. *Kraft*, 970 F.2d at 322. Misrepresentations about a product's central characteristics, such as its cost, are presumed to be material. *In re Thompson Medical Co.*, 104 F.T.C. 648, 1984 WL 565377, at *102 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir.

---

[35] Defendants are liable for their own actions and those of their agents. *See, e.g.*, *FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009); *Standard Distributors, Inc. v. FTC*, 211 F.2d 7, 13 (2nd Cir. 1954). Here, Defendants' agents include their affiliates, who bombard consumers' cell phones with spam text messages with false promises of "free" merchandise. The SubscriberBASE Defendants also are liable for the actions of the All Square Defendants, which they pay to drive consumers to their websites. The FTC previously has taken action against principals for their affiliates' actions. *See FTC v. Clickbooth.com, LLC*, No. 12-cv-9087 (N.D. Ill. stipulated final judgment entered Nov. 28, 2012) (Darrah, J.); *FTC v. Coleadium, Inc.*, 12-cv-06964 (N.D. Ill. stipulated final judgment entered Sept. 4, 2012) (Chang, J.).

1986).[36] Claiming a product is "free" when it actually costs money is materially misleading. *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1063-64 (C.D. Cal. 2012).

In determining the likelihood of deception, courts look to the "overall, net impression" created by the advertisement. *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 958-59 (N.D. Ill. 2006); *see also Kraft*, 970 F.2d at 314. To discern the net impression, courts view the advertisement "as it would be seen by the public generally" including those "who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions." *Niresk Indus., Inc. v. FTC*, 278 F.2d 337, 342 (7th Cir. 1960) (quotation marks and citation omitted); *see also FTC v. Crescent Pub. Group, Inc.*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) (evaluating ads, "it is appropriate to look not at the most sophisticated, but the least sophisticated consumer").

Here, Defendants, on their websites and in their affiliates' text message spam, expressly and prominently promote "free" merchandise. Of course, the most reasonable interpretation of "free" is free.[37] Viewed in any context, Defendants' websites give the net impression that they are giving away "free" merchandise; viewed on a mobile device, Defendants' claim of "free" merchandise is nearly the only legible term. But the merchandise is not free, and Defendants fail to disclose that it in fact costs money to be eligible for the gift cards. If consumers knew that to receive a purportedly "free" gift card, they would have to spend money signing up for thirteen third-party offers, and convince three friends to do the same, many never would attempt to obtain

---

[36] *See also In re Auto. Breakthrough Scis., Inc.*,126 F.T.C. 229, 274, 1998 WL 34300611, at *30 (1998) ("[C]laims regarding cost are presumed material.") (citing FTC Policy Statement on Deception, 103 F.T.C. 174, 175, 182, 1984 WL 565319, at *44-45, *49 (1984) (appended to *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)).

[37] The FTC previously has taken action against nearly identical false claims of "free" merchandise. *See United States v. Adteractive, Inc.*, 07-cv-5940 (N.D. Cal. filed Nov. 26, 2007); *United States v. Member Source Media LLC*, 08-cv-642 (N.D. Cal. filed Jan. 30, 2008); *United States v. ValueClick, Inc.*, 08-cv-01711 (C.D. Cal. filed Mar. 13, 2008). Moreover, FTC guidance states, "when the purchaser is told that an article is 'Free'"–for example, when the purchaser buys another product with the "free" article–"the word 'Free' indicates that he is paying nothing for that article . . . ." 16 C.F.R. § 251.1(b)(1).

it. This promotion of gift cards as "free" without disclosing the costs that go with it is deceptive. The fine-print disclosures on some of the webpages clearly do not cure this deception.[38]

Defendants' claims about their purpose for seeking consumers' information also is deceptive. Defendants convince consumers to turn over extensive personal information by giving them the impression that doing so is the "last step" to "send" them the "free" merchandise. In truth, few if any consumers receive the merchandise, and Defendants then sell the personal information they have collected to a variety of third-party marketers.

### b. Sending Text Message Spam is Unfair and Illegal

Defendants also are responsible for their affiliates' unfair blasting of text message spam that consumers often must pay for but cannot avoid. An act or practice is unfair under Section 5 of the FTC Act if: (1) it causes or is likely to cause substantial consumer injury; (2) the harm is not outweighed by any countervailing benefits; and (3) the harm is not reasonably avoidable by consumers. 15 U.S.C. § 45(n); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010). The FTC has employed this approach in other recent cases challenging text message spam. *FTC v. Flora*, 11-cv-299 (C.D. Cal. temporary restraining order entered Feb. 23, 2011); *FTC v. Shopper Systems, LLC*, 12-cv-23919 (S.D. Fla. temporary restraining order entered Oct. 31, 2012).

Each of the elements of unfairness is satisfied here. As noted above, millions of consumers pay for text messages each month; in aggregate, Defendants' spam text message

---

[38] The occasional, fine-print disclosures buried on Defendants' websites do not remedy their deceptive, bold-font claims that the merchandise is "free." "Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." *FTC v. U.S. Sales Corp.*, 785 F. Supp. 737, 751 (N.D. Ill. 1992) (citation omitted); *see also FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006). FTC guidelines echo these court opinions. *See Dot Com Disclosures: Information About Online Advertising*, at 1-2 (available at http://business.ftc.gov/documents/bus41-dot-com-disclosures-information-about-online-advertising) (last accessed Feb. 26, 2013).

campaign has caused substantial consumer injury.[39] *Neovi*, 604 F.3d at 1157 (quoting *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 962 (D.C. Cir. 1985) ("An act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people . . . .'"). Moreover, text message spam promoting Defendants' "free" merchandise offers no countervailing benefits to consumers, who are harmed by being drawn into Defendants' scheme. There hardly can be any countervailing benefits to sending text message spam because it is already illegal under the Telephone Consumer Protection Act.[40] Nor does competition benefit, as major retailers whose merchandise is touted in the text message spam and wireless carriers whose clients are harmed by text message spam have spent resources to address this scam. Finally, consumers cannot avoid this harm: they have no prior relationship with Defendants, and have not indicated an interest in receiving text messages from Defendants. Thus, they have no reason to anticipate the spam and no realistic way of avoiding it.

### 2. The Equities Tip Decidedly in the Commission's Favor

Once the Commission has shown a likelihood of success on the merits, the Court must balance the equities, giving "far greater weight" to the public interest than to Defendants' private concerns. *World Travel*, 861 F.2d at 1029 (citation omitted). The public equities in this case are compelling, as the public has a strong interest in halting Defendants' deceptive conduct and preserving assets necessary to provide effective final relief to victims. Defendants, by contrast, have no legitimate interest in engaging in illegal conduct. *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).

---

[39] CTIA Dec., PX9, ¶¶ 6(2)-(3).

[40] 47 U.S.C. § 227 *et seq.*; *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953-54 (9th Cir. 2009).

### 3. Cranmer, Mazzella, McVeigh, and French Are Individually Liable

Defendants Cranmer, Mazzella, McVeigh, and French are individually liable for the deceptive and unfair practices. An individual defendant is liable under the FTC Act when he (1) participated directly in, or had some authority to control, a corporation's deceptive practices, and (2) knew or should have known of the practices. *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005); *Bay Area*, 423 F.3d at 636.[41] As discussed above, defendants Cranmer, Mazzella, and McVeigh, were all involved in registering the All Square defendants' "free" gift card websites and arranging for advertising leading to these websites. French controlled and knew of the SubscriberBASE entities' practices: he is the President of both entities, is a signatory on the account used to fund this scam, and signed the settlement with the Florida Attorney General's office based on the same essential practices at issue here. *See, e.g.*, *World Media Brokers*, 415 F.3d at 764 (corporate officer "hard-pressed to establish that he lacked authority or control over" corporate entities); *Amy Travel*, 875 F.2d at 574.

### C. This Court Should Enter the FTC's Narrowly Tailored Proposed TRO

In fashioning appropriate injunctive relief, this Court has authority "to grant any ancillary relief necessary to accomplish complete justice[.]" *World Travel*, 861 F.2d at 1026 (quotation marks and citation omitted); *see also Febre*, 128 F.3d at 534. The FTC requests that the Court issue a TRO that, by prohibiting future law violations and preserving assets and documents, preserves the status quo and ensures that the Court can grant effective final relief.[42]

Among other relief, the FTC seeks eventual restitution for the victims of Defendants' scheme. When a district court determines that it is "probable that the FTC [will] prevail in a final determination of the merits," it has "a duty to ensure that . . . assets . . . [are] available to

---

[41] The FTC does not need to show intent to defraud. *Amy Travel*, 875 F.2d at 573-74.

[42] A proposed TRO has been submitted to the Court with this motion.

make restitution to the injured customers." *World Travel*, 861 F.2d at 1031. Sections III and IV of the FTC's proposed TRO require Defendants to preserve assets and produce a financial statement and an accounting. These sections are necessary and appropriate to locate ill-gotten gains and to prevent the concealment or dissipation of assets during this litigation.

The FTC's Proposed TRO also contains provisions necessary for halting Defendants' illegal conduct and maintaining the status quo. Sections I and II prohibit Defendants from further violating the FTC Act. Sections VI and VII require Defendants to preserve records and report new business activity. Section VIII prohibits the disclosure of customer information, while Section IX allows for expedited discovery of information relevant to a preliminary injunction hearing. These are necessary provisions to stop Defendants' scam and to help identify the scope of unlawful practices, other participants, and the location of assets.

## V.     CONCLUSION

Defendants have caused and will continue to cause substantial public injury through their violations of the FTC Act. The FTC respectfully requests that the Court issue the proposed TRO to protect the public from further harm and to help ensure the possibility of effective final relief.

Dated: February 28, 2013                                        Respectfully submitted,

                                                                                 DAVID C. SHONKA
                                                                                 Acting General Counsel

                                                                                 /s/ Matthew H. Wernz
                                                                                 Matthew H. Wernz
                                                                                 Steven M. Wernikoff
                                                                                 Federal Trade Commission
                                                                                 55 West Monroe Street, Suite 1825
                                                                                 Chicago, IL 60603
                                                                                 Tel.: (312) 960-5596
                                                                                 Fax: (312) 960-5600
                                                                                 Email: mwernz@ftc.gov
                                                                                 Attorneys for Plaintiff
                                                                                 Federal Trade Commission